# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 11, 2018

BY ECF & HAND DELIVERY

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     **United States v. Jose Cardenas**
        **17 Cr. 551 (JPO)**

Dear Judge Oetken:

I write in advance of Mr. Cardenas's sentencing, scheduled for September 17, 2018. Mr. Cardenas pleaded guilty to Possession of a Firearm by a Felon on March 12, 2018. For the reasons explained more fully below, we join in the Probation Department's rarely-seen recommendation for a downward variance to 12 months of incarceration. But we ask the Court to impose its sentence in the form of home detention, as a condition of supervised release, instead of detention in a Bureau of Prisons ("BOP") facility.

The requested sentence will facilitate continued success of Mr. Cardenas's ongoing reentry. A home detention sentence will adequately punish Mr. Cardenas while allowing him to fully rehabilitate through:

(1) consistent drug treatment;
(2) continued access to his surgeon and physicians who still are refining his evolving medical regimen; and
(3) accessibility to the disability benefits for which he waited months for approval.

Home incarceration will serve the statutory purposes of sentencing without causing unique and counterproductive harm to Mr. Cardenas and, naturally, to the community at large.

Hon. J. Paul Oetken                                                          September 11, 2018
Re:   United States v. Jose Cardenas                                          Page 2
      17Cr. 551 (JPO)

## I.        PSR Objections/Clarification

Mr. Cardenas proposes the following changes to the Presentence Report ("PSR"):

A.   Adjustment to Pretrial Supervision, ¶ 4: The PSR reports Mr. Cardenas failed a
     drug test administered by the Probation Department in connection with his
     presentence interview. This positive test seems to be an aberration as Mr.
     Cardenas has passed every other test administered since his release from pretrial
     detention on December 27, 2017. Mr. Cardenas is regularly tested by Pretrial
     Services and by the Ramon S. Velez Recovery Center, where he receives
     outpatient drug treatment services.[1] All of his other tests have been negative.

B.   Substance Abuse, ¶ 63: The report mistakenly states that Mr. Cardenas attended
     Ramon Velez Recovery Center in 1998. However, Mr. Cardenas did not begin
     treatment at Ramon Velez until this year. In 1998, Mr. Cardenas enrolled in a
     chemical dependency program at South Oaks Hospital in Amityville, NY.

## II.       The Standard

As Your Honor knows, the guidelines range is but one of many factors set forth in 18
U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See, generally,
United States v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only *not mandatory* on
sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129
S.Ct. 890, 892 (2009) (emphasis in original). In every case, the sentencing court "must make an
individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 597, 602
(2007).

The overarching command of Section 3553(a) is the parsimony principle: that sentences
should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution,
deterrence, and rehabilitation.

## III.      Mr. Cardenas's Personal Background

Drug addiction and its attendant poor decision-making has consumed nearly all of Mr.
Cardenas's life. Drug use was prevalent in his childhood home and among his friends and male
role models. His parents' drug and alcohol abuse created an unstable, violent, transient
upbringing. Left to his own devices and with no adult supervision, Mr. Cardenas sought refuge
and direction from his older brothers and friends. His older brothers were already running the
streets and doing drugs, his friends were doing the same, so he followed their lead. Drugs were

---

[1] *See* Letter from Andrew Karim, Ramon Velez Recovery Center, Ex. A.

Hon. J. Paul Oetken                                                      September 11, 2018
Re:   <u>United States v. Jose Cardenas</u>                                      Page 3
     17Cr. 551 (JPO)

not just a normal part of life, they were reinforced as acceptable and encouraged. The development of Mr. Cardenas's early addiction is, therefore, unsurprising.

     In her letter to the Court, Mr. Cardenas's sister, Maria Cardenas, best illustrates the role of drugs in their childhood home:

> Growing up, our parents used drugs. It started out with weed, then cocaine. On top of that they were heavy drinkers. They used drugs and drank alcohol every day. Our mom went on to use crack. It was their choice. They chose drugs over providing a safe home for us. I remember when I used to come home from school my parents were never around. . . . They were never around for us. My brothers were always in the streets. Our parents rarely provided for them, let alone gave them any rules. Jose had no structure and was pressured to run the streets for survival. . . . My worst memory is of my mother smoking crack with my brother, Edwin. I was shocked. How could she possibly smoke crack with her son? Our family was dysfunctional to say the least.[2]

Mr. Cardenas also witnessed his parents' drug use. He watched his father snorting cocaine several times.[3] He noticed his mother stayed awake for days and displayed erratic behavior.[4]

     Violence and instability similarly permeated Mr. Cardenas's childhood. His father physically abused his mother.[5] Sometimes Mr. Cardenas stepped in between his parents to protect his mother from his father's beatings.[6] The volatile couple separated when Mr. Cardenas was 16 years old.[7] And his father, the sole breadwinner, moved to the Dominican Republic.[8] Though the family receiving welfare benefits after his father left, bills went unpaid, and the family was evicted.[9] The remaining family of four moved into the small apartment of a family friend, joining eight other people.[10] During this period of upheaval in an already difficult childhood, Mr. Cardenas began using cocaine.[11] He has battled the drug addiction since then.

### IV.   Mr. Cardenas's Addiction History and Evolving Medical Interventions Support a Sentence of Time Served, Followed by a Period of Home Detention as a Condition of Supervised Release

---

[2] Letter from Maria Cardenas, Ex. B, p. 1.
[3] PSR at ¶ 51.
[4] *Id.*
[5] *Id.* at ¶ 50.
[6] *Id.*
[7] *Id.* at ¶ 52.
[88] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at ¶ 62.

Hon. J. Paul Oetken                                              September 11, 2018
Re:   United States v. Jose Cardenas                                      Page 4
      17Cr. 551 (JPO)

> A.   Only comprehensive drug treatment, not incarceration, will rehabilitate Mr.
>      Cardenas and prevent him from recidivating.

The Court need only look to Mr. Cardenas's rap sheet to see the role his addiction played in his development—first, as a child and adolescent and, secondly, as a man. Mr. Cardenas was first arrested at 16 years old for possession of drugs.[12] It was his first criminal adjudication.[13] His second arrest followed less than a month later, again for drug possession.[14] He picked up two more drug possession convictions—one at 25 years old and another at 43.[15] He was arrested for other offenses while in possession of narcotics—at 21, twice at 36, at 37, and again at 45 years old.[16]

Mr. Cardenas collected several low-level theft-related and trespassing convictions. At 16-years old, he pleaded guilty to petit larceny and possession of stolen property.[17] At 36, he was convicted of criminal trespass after purchasing drugs inside an apartment building in the Bronx.[18] Similarly, at 37, he twice was arrested for trespassing and on one of those occasions officers found him in possession of heroin. These are the kinds of convictions courts often see in the criminal histories of people suffering from life-long drug addiction.[19]

Notably, Mr. Cardenas was in the throes of his heroin addiction when he committed the offense for which the Court will sentence him. Despite a 2014 diagnosis of an autoimmune neuromuscular disease, Mr. Cardenas continued to use heroin.[20] Mr. Cardenas's addiction was so severe that he could not help but risk his life to satiate his addiction. Though shocking to most of us, his inability to quit is typical of life-long addicts. According to the National Institutes of Health, "Chronic drug abuse causes long-lasting brain changes that contribute to an addicted person's compulsion to seek and use drugs despite catastrophic consequences."[21]

Decades of research into substance abuse prove that drug addiction is a disease analogous to other chronic diseases, such as heart disease and diabetes.[22] Research shows that the most effective and meaningful solution to drug addiction and, consequently, its attendant aberrational

---

[12] PSR at ¶ 26; see also id. at p. 21 ("It is likely that Cardenas's substance abuse issues contributed to his extensive involvement in criminal activities.").

[13] Id.

[14] Id. at ¶46.

[15] Id. at ¶¶ 34, 40.

[16] Id. at ¶¶ 33, 35, 36, 41.

[17] Id. at ¶¶ 27 – 28.

[18] Id. at ¶ 36.

[19] Nat'l Council on Alcoholism and Drug Dependence, "Alcohol, Drugs and Crime" (June. 27, 2015), https://www.ncadd.org/about-addiction/alcohol-drugs-and-crime ("Alcohol and drugs are implicated in an estimated 80% of offenses leading to incarceration in the United States such as domestic violence, driving while intoxicated, property offenses, drug offenses, and public-order offenses.")

[20] M. Cardenas Letter, Ex. B, at 1 – 2. (When he started getting sick with MG . . . [h]e was still drugs.")

[21] Nat'l Institutes of Health, "Fact Sheet: Addiction and the Criminal Justice System" (Oct. 2010), p.1, https://report.nih.gov/nihfactsheets/Pdfs/AddictionandtheCriminalJusticeSystem(NIDA).pdf

[22] Nat'l Inst. on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction, NIH Pub. No. 14-5605, 5 (July 2014).

Hon. J. Paul Oetken                                                        September 11, 2018
Re:   <u>United States v. Jose Cardenas</u>                                      Page 5
        17Cr. 551 (JPO)

behavior, is drug treatment that incorporates both cognitive behavior therapy and contingency
management.[23] And, prison is not the appropriate setting for intensive, individualized treatment.

        Even if the Court recommends drug treatment during an incarceratory term, Mr. Cardenas
still may not receive drug treatment. The National Institutes of Health report that "half of state
and federal prisoners meet the criteria for drug abuse and dependence and yet fewer than 20
percent who need treatment receive it."[24] Similarly, Mr. Cardenas is unlikely to reap the benefits
of BOP's popular, and most effective, program—the Residential Drug Abuse Program
("RDAP").[25] The Bureau of Prisons estimates that there are thousands of prisoners on the RDAP
waiting list.[26] Because Mr. Cardenas's sentence results from a firearm possession conviction, he
also is ineligible for RDAP's sentence reduction component, which would allow him to progress
into community-based treatment when similarly situated prisoners in the program transition.[27]

        BOP is a bureaucracy of enormous size and dimension. Its operational concern is
security. Its analysis is not nuanced, individually tailored, or insightful. It does not always follow
the considered sentencing recommendations of District Courts. It is of significant concern that
there is a real chance Mr. Cardenas's drug needs may go largely untreated, or inadequately
treated, during any further period of incarceration.

        Mr. Cardenas has made great strides toward defeating his addiction since his release from
pretrial detention. Mr. Cardenas enrolled in treatment at the Ramon S. Velez Recovery Center on
January 22, 2018.[28] He attends the program six days a week, has passed every drug test regularly
conducted by his counselor, receives daily Methadone medication, and engages in counseling
sessions one to two times a month.[29] Concurrently, Mr. Cardenas has complied with his release

---

[23] Dutra et al, *A Meta-Analytic Review of Psychosocial Interventions for Substance Use Disorders*, 165 Am.
J. Psychiatry 179, 183 (2008).

[24] Nat'l Institutes of Health Fact Sheet, *supra*, at 1.

[25] *See, generally,* BOP Program Statement 5330.11, Ch. 2.5 (2009), available at
https://www.bop.gov/policy/progstat/5330_011.pdf'; (Providing details about the RDAP program,
eligibility, and criteria.);  Dept. of Justice Proposed Rule, 28 C.F.R. 550, p. 13:

> Offenders who completed the residential drug abuse treatment program and had been
> released to the community for three years were less likely to be re-arrested or to be
> detected for drug use than were similar inmates who did not participate in the drug abuse
> treatment program. Specifically, 44.3 percent of male inmates who completed the
> program were likely to be re-arrested or revoked within three years after release to
> supervision in the community, compared to 52.5 percent of those inmates who did not
> receive such treatment.

Available at https://s3.amazonaws.com/public-inspection.federalregister.gov/2015-17707.pdf.

[26] Families Against Mandatory Minimums, "Frequently Asked Questions about the Residential Drug
Abuse Program (RDAP)," p. 2 (May 13, 2012), https://famm.org/wp-content/uploads/FAQ-Halfway-
House-4.24.pdf.

[27] *See* 28 C.F.R. § 550.55(b)(5)(ii) ("[T]he following categories of inmates are not eligible for early
release . . . Inmates who have a current felony conviction for . . . [a]n offense that involved the carrying,
possession, or use of a firearm . . . ").

[28] A. Karim Letter, Ex. A.

[29] *Id.*

Hon. J. Paul Oetken                                                          September 11, 2018
Re:   United States v. Jose Cardenas                                                     Page 6
       17Cr. 551 (JPO)

conditions, regularly meeting with his Pretrial Officer and abstaining from criminal activity. He
also credits his Pretrial Officer with helping him maintain his sobriety through the officer's
sincere encouragement and advice. A prison sentence would only serve to disrupt the
foundations of Mr. Cardenas's successful reentry and sobriety.

> **B.** The delicate nature of Mr. Cardenas's Myasthenia Gravis illness mitigates in
> favor of home detention and against incarceration in a prison.

Mr. Cardenas joins in the Probation Department's conclusion that a variance "is warranted
in light of [Mr. Cardenas's] medical issues."[30] Mr. Cardenas suffers from Myasthenia Gravis
("MG"), a chronic autoimmune neuromuscular disorder. MG causes muscle weakness, preventing
a person from controlling his muscles and causing altered speech, difficulty swallowing, and
limited use of muscles and limbs. The disorder can become life-threatening during a myasthenic
crisis in which muscles that control breathing are too weak to function. After suffering multiple
myasthenic crises, Mr. Cardenas's doctors continue to tweak his treatment through medication
management and medical procedures.

Mr. Cardenas was first diagnosed in 2014.[31] However, his condition became progressively
worse and, in the summer of 2016, he experienced his first myasthenic crisis. He was hospitalized
at Jacobi Hospital, placed in a medically induced coma, and intubated. Once he stabilized, doctors
continued Mr. Cardenas on daily medication. They also tried treatments aimed at reducing the
daily effects of MG while also reducing the likelihood of another myasthenic crisis. In 2016,
doctors began intravenous immunoglobulin ("IVIG"), a process through which immunoglobulin
is separated from blood donor plasma, purified, and then infused into the recipient's veins. The
combination of medication and regular IVIG treatments staved off a myasthenic crisis for a while.
However, Mr. Cardenas continued to experience muscle weakness and vision interruption.

On November 20, 2017, while in pretrial detention in this case, Mr. Cardenas's began
experiencing symptoms signaling an impending myasthenic crisis.[32] MCC medical staff sent him
to the emergency room at Brooklyn Hospital Center, where initially he was treated for both MG
and possible pneumonia. Just before discharge a week later, he experienced an acute myasthenic
crisis, fell into a coma and was intubated. Mr. Cardenas's family and defense counsel were not
notified of his hospitalization or his dire condition.

Mr. Cardenas remained at the hospital and, then, rehabilitation centers until after the Court
granted him bail on December 20, 2018. Mr. Cardenas was subsequently admitted to the
emergency room several times. His doctors tried to control his MG through consistent medication
and plasmapheresis, a process that filters blood and removes antibodies from the patient's blood
plasma. On February 14, 2018, surgeons removed Mr. Cardenas's thymus gland, hoping it would

---

[30] PSR at p. 21.
[31] PSR at p. 21.
[32] For more detailed discussion of Mr. Cardenas's myasthenic crisis while in BOP custody, please see the
parties' and BOP's December 2017 letters to the Court filed under seal.

Hon. J. Paul Oetken                                                                 September 11, 2018
Re:   <u>United States v. Jose Cardenas</u>                                          Page 7
        17Cr. 551 (JPO)

send his MG into remission. His doctors reinstated his prior daily pyridostigmine (cholinesterase inhibitor) and prednisone (steroid) prescription, adding azathioprine (immunosuppressive). However, to test the efficacy of the surgery, doctors slowly are lowering Mr. Cardenas's prednisone prescription, hoping to eliminate it altogether. If he remains in the community, they will continue to modulate and monitor his medication regimen in the coming months until it is under control or, possibly, fully in remission.

C.   <u>Incarceration will not serve the purposes of sentencing.</u>

 Mr. Cardenas credits his November 2017 myasthenic crisis as his ultimate wake up call. Unlike his prior crisis, this time, he was isolated from everyone other than medical staff and a 24-hour guard. He was chained to a hospital bed, and  could not watch television or read because of temporary visual impairment precipitated by the myasthenic crisis. He had no communication with family. He did not know if his loved ones even knew where he was or if he was alive. He knew he had come close to death, first in the cement walls of a jail cell, and then in the sterile, lonely hospital room. He thought he may never see his family again, he could not even say goodbye.

During that experience, Mr. Cardenas resolved to change his life. He realized he was too old and too sick to continue letting his addiction, and resultant bad choices, control his life. Once he returned home, he enrolled in drug treatment, engaged with his Pretrial Officer, and underwent the months-long application process for Social Security disability benefits.

This week, Mr. Cardenas learned that the Social Security Administration approved his application, a benefit he will lose if incarcerated.[33] He now can contribute to his household and send money to help his daughter with her college expenses. Coupled with his other lifestyle changes, this new development give him a sense of accomplishment and pride that he has not experienced in recent memory. It motivates him to double down on the promise he made himself during his myasthenic crisis.

Any term of incarceration will serve to only punish Mr. Cardenas without advancing the other purposes of sentencing. The government argues that further incarceration is necessary to prevent rescidivism.[34] In the abstract, the theory of progressive punishment posits that if a prior prison sentence did not deter a second offense, then greater punishment may be necessary.[35]  But

---

[33] Social Security Administration, "What Prisoners Need to Know," p. 3 (July 2017)("If you weren't *receiving* . . . Social Security disability . . . before you went to prison . . . you'll need to file a new application for benefits if you think you may be eligible.") (*emphasis added*); *compare id.* at 2 ("If you're receiving SSI, your payments are suspended while you're in prison. Your payments can be reinstated in the month you're released. However, if your confinement lasts for 12 consecutive months or longer, your eligibility for SSI benefits will terminate and you must file a new application for benefits.")

[34] Gov't Sentencing Letter (Sept. 10, 2018), ECF No. 28, pp. 2 – 3 ("A Guidelines sentence is also necessary to deter the defendant . . . and to protect the public from further crimes by this defendant, because the defendant's prior convictions and sentences have not deterred his criminal behavior.").

[35] *See, e.g., United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) (noting in the context of the career offender guideline that the amount of prior prison time is relevant to determining the deterrent effect of the sentence to be imposed).

Hon. J. Paul Oetken                                                    September 11, 2018
Re:   <u>United States v. Jose Cardenas</u>                                             Page 8
      17Cr. 551 (JPO)

recent empirical research confirms what many involved in the criminal justice system already suspected—that prison is criminogenic and that long sentences—even for repeat offenders—can be counterproductive.[36] This point is evidenced by Mr. Cardenas's introduction to heroin while incarcerated at Riker's Island, resulting in addiction and subsequent convictions.[37]

A time-served sentence, followed by a period of home detention, as a condition of supervised release, would serve all purposes of sentencing. It would punish Mr. Cardenas by imposing the strictest liberty restrictions available outside of prison; therefore, deterring him and others and promoting respect for the law. It would also facilitate his continued addiction recovery, an integral form of rehabilitation that decreases the risk of recidivism and protects the community. Importantly, the sentence will allow Mr. Cardenas to continue his ongoing MG treatment as his doctors work to find a balanced regimen to prevent future crises.[38]

## V.   Conclusion

For the reasons set for above, and any that may appear to the Court, I urge Your Honor to impose a sentence of time served, followed by a period of home confinement as a condition of supervised release. Such a sentence will satisfy all purposes of sentencing.

Respectfully submitted,

_/s/_____
Jullian D. Harris
Assistant Federal Defender

cc:   Alison Moe, Assistant United States Attorney

---

[36] *See* Daniel P. Mears & Joshua C. Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, J. of Research in Crime & Delinquency at 35 (2017) ("[A]nalyses of second-time felons did not clearly support the hypothesis that progressions to more severe types of sanctions would decease recidivism. They did so for 4 of 12 progressions and had no effect on one other; in the remaining 7, progressions to less severe sanctions—especially probation and intensive probation—were associated with a lower probability of recidivism."), available at http://journals.sagepub.com/doi/abs/10.1177/0022427817739338.

[37] *See* PSR at ¶ 62.

[38] Courts have found collateral consequences may provide appropriate grounds for downward variances. *See e.g. U.S. v. Dominguez*, 296 F.3d 192 (3rd Cir. 2002)(clarifying district court's ability to impose below-guideline sentence where defendant's family was physically and financially dependent upon her); *see also U.S. v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (In a bank fraud case on remand, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *see also U.S. v. Davis*, 2008 WL 2329290 (S.D.N.Y June 5, 2008)(time served imposed where court found further incarceration would deny his children the "care and guidance clearly needed at this point in their lives"); *see also U.S. v. Bortnick*, 2006 WL 680544 (E.D.PA. March 15, 2006)(unpublished opinion)( seven-day sentence imposed where defendant's son born with a severe disability, and court found further incarceration would serve no social or penal purpose).

# EXHIBIT A



**Acacia Network**

ROOTED IN THE COMMUNITY SINCE 1969

9/10/2018

To Honorable Judge Oetken,

I'm writing to report that Mr. Jose Cardenas is currently enrolled at RVTP program since 1/22/2018. Mr. Jose Cardenas attends 6X/Weekly and has been meeting with his Primary Counselor for counseling sessions 1-2X monthly. Mr. Jose Cardenas gets daily medicated with 40mgs of Methadone at RVTP OTP and continues to abstain from all drug use as evident from his toxicology results (9/6/18, 8/28/18, 8/13/18, 8/1/18, 7/25/18, 7/17/18, 6/19/18, 5/2/18, 4/10/18, 3/26/18, 3/2/18, 2/20/18, 2/8/18, 1/29/18). Mr. Cardenas get drug tested 2-4 times monthly. RVTP OTP Hours of Operation are from 7AM-2:30PM on Monday-Friday. Patient attends RVTP OTP from Monday to Saturday. If you have any questions, please contact me for any information.

Respectfully,

*Andrew Karim, LMHC, CASAC-2*

Andrew Karim LMHC/CASAC Level 2

Ramon S. Velez Recovery Center
Andrew Karim/ACACIA NETWORK
Substance Abuse Counselor
754 E. 151st Street
Bronx, New York 10455
Tel. #347-352-2543 Ext. 2443
AKarim@promesa.org / www.acacianetwork.org
Excellence| Commitment |Customer Service |Leadership

Acacia Network

| Milagros Baez O'Toole | Raul Russi | Hon. Hector L. Diaz | Pamela Mattel | Tomas Del Rio |
| Chairwoman of the Board | Chief Executive Officer | President | Chief Operating Officer | Chief Financial Officer |

# EXHIBIT B

August 27, 2018

Dear Judge Oetken,

My name is Maria Cardenas. I'm Jose's sister. I am the eldest of my parents' four children, Luis, Edwin, and Jose. Jose is the youngest of all of us. We never had a stable home or family life. When Jose was born we lived in Brooklyn, we then moved to Massachusetts for a year or two, then to Patterson, New Jersey, then to the Bronx. I love my brother and would do anything to help him. Jose had a rough life, but he's a sweet and smart person who's always trying to help other people out. Over the past months, since he was released on bail, my family noticed many positive changes Jose has made. He seems hopeful for the future and grateful to be alive. I and my family are going to continue to support him and do anything we can to make sure he doesn't go back to those dark days.

Growing up, our parents used drugs. It started out with weed, then cocaine. On top of that they were heavy drinkers. They used drugs and drank alcohol every day. Our mom went on to use crack. It was their choice. They chose drugs over providing a safe home for us. I remember when I used to come home from school, my parents were never around. That's why I left once I could because I knew they couldn't afford to feed all of us. I figured one less mouth to feed. When I was school they were never home. They were never around for us. My brothers were always in the streets. Our parents rarely provided for them, let alone gave them any rules. Jose had no structure and was pressured to run the streets for survival. There was even a time where all three of my brothers were arrested. My worst memory is of my mother smoking crack with my brother Edwin. I was shocked. How could she possibly smoke crack with her son? Our family was dysfunctional to say the least.

In 1995 our brother Luis was killed. Some guy who had beef with him, no one knows what about, it may have been drug or gang related, killed Luis.  Jose was in prison when Luis died. Jose attended the funeral. He was shackled and they warned us that no one could talk to him or touch him or else they'll take him away. They made sure we didn't approach Jose. These were extremely tough times for family. More than just embarrassing, it hurt that we couldn't console Jose the way we wanted to. I remember my mother was just holding it in all of the pain – two of her sons were in prison and the third dead. I hate to place blame, but my parents did not do a good job raising my brothers. They were too busy using drugs with the neighbors that they didn't support Jose.

Jose is wrong for what he did in the case that brings him before you, but I just hope to give you a clearer picture of how terrible his upbringing was and how well he's doing since out on bail. I know this is no excuse and it's hard to describe how hard and painful it is for me to speak about these things.

When Jose started getting sick with MG, Tina would call me a lot and tell me what's going on with Jose's health, that his arm would go numb. He was still using

drugs. I kept telling him that all those years of putting drugs in his body were catching up to him. We begged him to see a doctor. Jose looked really bad, but I think he was like most men are, acting like they don't need to see a doctor, but actually afraid of getting bad news. His MG diagnosis has been devastating for our family. Having already lost Luis and my mom, we can't bare the idea of losing Jose.

When Jose was in jail last year and he got sick, we all thought the worst. We kept calling his lawyer's office, the jails, and random hospitals throughout the city for information. No one knew anything. That time around Thanksgiving was the scary. I tried not to believe that he was somewhere dead. But it was hard not to think to the worst. We were even more scared because we know what Jose has been through with his health. He's come close to dying before. With his illness, he can randomly go into crises and be intubated in an ICU. It's really unexpected. I give a lot of credit to Tina for all she does for him because it's just too frightening. The fear of the unknown. Of not knowing what's going to happen to him.

My doors are always open for Jose. I would never leave him on the streets. I'll always support Jose and be there for him. I really want him to leave the Bronx. I know it's easy to say he's learned his lesson, and you probably hear that every day. But I can only go by what I see. He never had a crises like he did in jail – with no family around -- and since he's been out on bail he's been on a positive path. Always attending his appointments and rehab and checking in with his officer. I hope that you give him a chance to continue down this positive road of recovery, rehabilitation, and just staying alive and healthy.

Thank you so much for reading my letter.


Sincerely,

Maria Cardenas



# EXHIBIT C

June 2, 2018

Dear Honorable Judge Oetken,

Thank you for taking the time to read this letter. My name is Tina Robles, and Jose Cardenas is my partner. Jose and I have been in a relationship for 6 years, but I've known him since I was around 15 years old, for about 30 years. We use to live on the same block when we were younger on University Ave in the Bronx. The reason for this letter is to relate to the Court how I view Jose Cardenas, how helpful he is, how much he has suffered from his illness, and how much we love and support him.

Jose is disabled at this moment. He found out about four years ago that he has a disease called myasthenia gravis. The doctors told us that his prognosis isn't great. Every day is a new symptom. There's no way to know what's going to happen to him. His muscles give out randomly, one day it could be his arm and another day his leg, his speech slurs sometime. The worst is when his chest muscles top working and he can't breathe. He can't eat. He can't swallow. Whenever this happens they have to put him to sleep and intubate and put him in the ICU. I remember at least five times that this has happened to him. Each intubation and ICU stay is no less scary or serious. Each time we have tough conversations with doctors about what could possibly happen to him if he doesn't get better soon enough.

Last November, when he was at the MCC, he called me regularly. I made sure he had money in his commissary account. Around Thanksgiving he didn't call me and I thought that was weird. Jose would never not call me to let me know that he's okay. I kept calling the jail and his lawyer's office to check if everything thing was okay. After a few weeks, I learned that he was at the hospital in the ICU. I called a lot of hospitals in NYC to see if he was there. This was probably the worst time of our relationship. Knowing how sick he can get, I feared the worst. I thank God that he pulled through and eventually got bail. Jose has never been in that sort of situation before. Your Honor, that experience has changed him. For the first time he was alone throughout this mysathatic crisis. Usually I and his family are around to support him and help him pull through. This time he was alone. He always tells me how he was shackled and how bad it felt with no one there to visit him. He didn't know if we even knew that he was in the hospital.

Jose has been on a lot of medications since he's been released. He can no longer provide from himself or his daughter. He tries finding odd jobs, but most of the time he physically can't do the work. I see the frustration in his face when he isn't able to provide for his daughter. Despite these struggles, Jose has never even talked about doing anything illegal to get the money. I work for the NYC Department of Education as a School Aide and have supported him and his daughter the best I can. I don't have a lot, but I will do anything I can to support Jose. I'm just glad he's alive. Jose and I talk a lot about the terrible decisions he made and how important life is. Every day Jose seems to get closer to death. He's mentally and, more importantly, physically not the same person. He's weaker and sicker.

This is the most time I've ever spent with Jose, we see each other every day. Another thing that I'd like to mention his how much Jose loves animals. I remember he wanted to take in a stray cats. I told him we couldn't because we don't have space. So instead he gave the cat

food and made a space for it. Whenever we're outside he always notice the stray animals. These are some of the things that we talk about. I hope that Jose can maintain his current physical state, even if it's really weak, and enjoy the simple things in life like taking care of pets, going on walks, spending time with his family, and just living.

Jose talks every day about this case and how much he wishes he could start over. I try to remind him that he has to move forward. Jose is really a loving person, who cares very much about his family. As his partner, I've been closest to him and have seen who much he has changed, suffers from his illness, and regrets his actions in this case.

Jose really wants to fix his life and get help. Knowing that he has a chronic illness sometimes depresses him, but he hasn't given up and his family hasn't either. For example, he hasn't missed even one day of his program, attends all of his medical appointments, and takes all of his medications. He wants live and do right for his daughter and his family. This is a wakeup call and he knows it.

I sincerely appreciate Your Honor considering my letter and really hope that you give Jose another chance.


Thank you,


Tina Robles

(347) 952-9799



# EXHIBIT D

May 25, 2018

Honorable Judge,

My dad, Jose Cardenas, means so much to me and my family. He is like a transformer; one year he is out and about with me running errands in the heart of New York City, and to me he's his strongest physically. The next year, he is in a hospital bed, physically at his weakest. But in his heart, he stayed the same emotionally. At the time I first knew he had a serious medical condition, I was sure my dad could beat it, get treatment, and get back being himself because my dad is strong. But alas, Myasthenia Gravis still haunts him to this day, with fatigue, sore and weakened muscles, terrible eye vision, and other daily symptoms. This still has yet to affect my father's perception of life. He is still the same comedic, emotional, and fully invested father he was when he was healthy.

Today, Your Honor, I beg you have mercy on my father. My dad means well, and he helps me when I'm away at college financially and emotionally when he can and with God's will when he cannot, my step-mother Tina will do her best to help me and for that I am extremely grateful considering my college education is, and has been since I was little, very important to me.

I know my father regrets what he has done that day. What he did was in no way acceptable and shouldn'y go unnoticed, but I sincerely think the time he did last year and all those weeks in a hospital bed is enough.

I'd like, finally, to give my gratitude to you, the Judge, for taking the time to read my letter. From the bottom of my heart, this means a lot to me and I honestly hope my words ring with you as you proceed to make your decision concerning my father, otherwise known as my best friend transformer.

Love,

Priscilla Cardenas



# EXHIBIT E





